### THE McCALDIN BROTHERS.
### THE J. J. TIMMINS.

(Circuit Court of Appeals, Second Circuit. March 17, 1914.)

No. 167.

TOWAGE (§ 3*)—TUGS ASSISTING STEAMSHIP TO DOCK—LIABILITY FOR STRANDING.

In a suit by the owner of a steamship against three tugs, employed to accompany her in proceeding under her own steam to her dock in New York harbor, and to dock her, to recover damages on account of her stranding because of the action of the flood tide, which caused her to sheer from her course, libelant *held* not to have sustained the burden resting upon it to prove that the navigation of the vessel had been put in charge of the tugs, or that the tugs caused the sheer, without which they could not be charged with responsibility therefor.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 3; Dec. Dig. § 3.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Texas Company against the steam tugs McCaldin Brothers and William J. McCaldin, the McCaldin Bros. Company, claimant, and the J. J. Timmins, Edward M. Timmins, claimant. Decree for respondents, and libelant appeals. Affirmed.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for appellant.

Peter S. Carter, of New York City, for The McCaldin Brothers.

Burlingham, Montgomery & Beecher, of New York City, for The J. J. Timmins.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. December 3, 1911, the steamer Texas, belonging to the libelant, the Texas Company, lay at anchor off Staple-

ton, Staten Island, awaiting the rise of the tide and the arrival of tugs before proceeding to her berth at Bayonne, N. J. The company notified McCaldin Bros. over the telephone the day before the steamer's arrival that she would want three tugs. They were in the habit of furnishing tugs for the company's steamers, but there is no testimony as to what the contract between the parties was further than that, for assistance to Bayonne of steamers proceeding under their own steam, McCaldin Bros. charged $15 for each tug, whereas, if the tugs towed, the charge would be $10 an hour for each tug. The contract in this case was clearly not one of towage. McCaldin Bros. sent two of their own tugs, viz., the William J. McCaldin and the McCaldin Brothers, and employed a third tug, belonging to other parties, named the J. J. Timmins.

The steamer started from her anchorage at 3 p. m. on the flood tide; time of high water at Shooters Island near the company's dock being 5:42. She proceeded under her own steam, with the tug William J. McCaldin on the port and the McCaldin Brothers on the starboard side forward; each holding on by a bow line only and using her own steam to keep up with the steamer. The J. J. Timmins was fast on the port quarter, with bow and stern and breast lines. None of the tugs was towing.

At some point not satisfactorily fixed, after the steamer had rounded Bergen Point, she took a sudden sheer to starboard and fetched up on submerged rocks, which cut through her bottom on the starboard side. The sudden stoppage and list to port parted the lines of the tugs, so that they were not able to render any service at all, even if there had been time to do so. The Texas Company filed this libel in rem against the tugs to recover the damages so sustained.

All the witnesses agreed, and the District Judge found, that the sheer was caused by the effect of the flood tide on the starboard quarter of the steamer. The place of stranding is in dispute, but we think it was at the southern end of the Middle Ground, between Bergen Point and Shooters Island. The proofs give but a meager account of the set and force of the tide, and none at all as to the place where the flood tide from the Arthur Kill meets the flood tide from the Kill Van Kull, or of the effect of the meeting. However, we will adopt the finding that the sheer was caused by the flood tide throwing the steamer's stern to port and her bow to starboard, without clearly understanding why the tide had more effect on the quarter than on the bow.

The District Judge dismissed the libel, on the ground that the tugs had nothing to do with the time of starting, which he found to have been the proximate cause of the accident. In other words, if the start had been an hour or so later, so strong a tide at Shooters Island would not have been encountered. For this reason he found it unnecessary to consider whether the navigation of the adventure was in charge of the master of the steamer or of Capt. Howe, the master of the tug William J. McCaldin, who was also on the bridge and was certainly in charge of the tugs. We cannot concur in this reasoning. It would be satisfactory upon proof made that the steamer could not safely pass Shooters Island at the stage of the tide in question. There

is, however, no such proof, and the supposition is not to be entertained. Persons competent to navigate the waters in question were bound to know the set and force of the tide at that time at that place. If there were the tendency to swing the steamer 'around, which is alleged, the navigator ought to have taken steps to overcome it. Instead of this, the natural operation of the tide appears to have been a total surprise, and so sudden that nothing whatever was done to counteract it. Therefore it is essential to determine who was in charge of the navigation and at fault for this.

There is no evidence as to the contract between the Texas Company and the McCaldin Bros. All we know is that McCaldin Bros. were to send three tugs to accompany the steamer, proceeding under her own steam, to her berth, and to dock her there; also that Capt. Howe of the tug William J. McCaldin was on the bridge with the master of the steamer. Howe and his witnesses say he merely made suggestions to the master, who was in sole charge; while the master and his witnesses say that Howe was put in charge of the steamer. Of course, there may be an arrangement whereby the control of the master shall be yielded to some one else; but the burden of proving it lies strongly on him who alleges it. We are not disposed to find that the master's authority in this case was displaced, and that the owners of the tugboats assumed responsibility for pilotage and navigation of this valuable steamer and cargo for the sum of $15 a tug. Much clearer proof would be necessary to bring us to such a conclusion. No doubt, as the tugs naturally accompanied the steamer to her berth, if she got into trouble on the way, they would have assisted her. If any tug did so negligently, either at the order of Capt. Howe or on her own motion, that tug would be responsible in rem, although acting gratuitously. What is charged here, however, against the tugs, is not acts of commission, but acts of omission, viz., that they did not take timely measures to counteract the effect of the flood tide. Such cases as The W. B. Mason, 142 Fed. 913, 74 C. C. A. 83, The Anthracite, 168 Fed. 693, 94 C. C. A. 179, and The Harry M. Wall (D. C.) 187 Fed. 278, in which the tug was under an engagement to tow, was actually towing, and her master in full charge of the operation, have no application.

Finding, as we do, that Capt. Howe was not in charge of the navigation and that the tugs were not under any duty to tow, the decree is affirmed.